1   LEVY, SMALL & LALLAS
    A Partnership Including Professional Corporations
2   LEO D. PLOTKIN (SBN 101893)
    MARK D. HURWITZ (SBN 151159)
3   815 Moraga Drive
    Los Angeles, California 90049
4   Telephone:    (310) 471-3000
    Facsimile:    (310) 471-7990
5
    Attorneys for Secured Creditor
6   Textron Financial Corporation

7

8                   UNITED STATES BANKRUPTY COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  | In re COASTLINE MANUFACTURING, | Case No. 6:09-bk-28324-BB
    | LLC,
12  |                                | Chapter 11
    |            Debtor.
13  |
    | EIN: 20-0618466                | **SECURED CREDITOR TEXTRON
14  |                                | FINANCIAL CORPORATION'S
    |                                | OBJECTION AND OPPOSITION TO
15  |                                | DEBTORS' MOTION FOR COURT
    |                                | AUTHORIZATION OF USE OF CASH
16  |                                | COLLATERAL**

17
                                       Date:  August 20, 2009
18                                     Time:  2:00 p.m.
                                       Place: Ctrm 1475
19

20

21

22

23

24

25

26

27

28

-i-
OPPOSITION TO DEBTORS' MOTION TO USE COLLATERAL

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

I. INTRODUCTION ........................................................................................................1

II. STATEMENT OF FACTS ............................................................................................2

    A. The Financing Relationship Between TFC and Borrower Debtors. .....................2

    B. The Secured Guaranties by the Guarantors. .........................................................3

    C. The Prior Defaults and the Forbearance Agreement............................................4

    D. The Defaults and Subsequent Bankruptcy. ..........................................................4

    E. The Indebtedness. .................................................................................................4

    F. Valuation of Collateral..........................................................................................5

    G. Debtors' Post-Petition Pro Forma.........................................................................6

III. THE CASH COLLATERAL MOTION MUST BE DENIED BECAUSE TFC IS NOT ADEQUATELY PROTECTED. ..........................................................................7

    A. Debtor Bears the Burden of Proof of Adequate Protection. ................................7

    B. Debtors Have Failed to Demonstrate that TFC's Interests Can be Adequately Protected .............................................................................................7

IV. ANY ALLOWANCE OF THE USE OF CASH COLLATERAL MUST BE STRICTLY CONDITIONED. .....................................................................................14

V. CONCLUSION............................................................................................................15

# TABLE OF AUTHORITIES

**CASES**

Bankwest, N.A. v. Todd,
    49 B.R. 633 (D.S.D. 1985)..................................................................................... 9, 14

In re American Sweeteners, Inc.,
    2000 WL 1010582 (Bankr. E.D. Pa. 2000).............................................................. 11, 12, 13

In re Colrud, 45 B.R. 169 (Bankr. D. Alaska 1984) ................................................................ 13

In re James River Assoc.,
    149 B.R. 790 (E.D. Va. 1992).................................................................................... 11

In re Liona Corp., N.V., 68 B.R. 761 (Bankr. E.D. Pa. 1987)................................................ 12, 13

In re Mediterranean Associates, L.P.,
    1993 U.S. Dist. LEXIS 18356 (E.D. Pa. 1993) ........................................................ 11

In re Middleton Place Associates,
    1993 U.S. Bankr. LEXIS 2171 (Bkrtcy. E.D. Pa. 1993) ........................................... 10

In re Schwinn Bicycle Co.,
    192 B.R. 477 (Bkrtcy. N.D. Ill. 1996) ....................................................................... 10

In re Sharon Steel Corp., 159 B.R. 165 (Bankr. W.D. Pa. 1993) ....................................... 10, 12, 13

In re The Atrium Development Co.,
    159 B.R. 464 (E.D. Va. 1993).................................................................................... 11

Kost v. First Interstate Bank of Greybull,
    102 B.R. 829 (D. Wyo. 1989).................................................................................... 11

LNC Investments, Inc. v. First Fidelity National Bank,
    1997 U.S. Dist. LEXIS 12858 (S.D.N.Y. 1997)........................................................ 12

Matter of Mickler,
    9 B.R. 121 (M.D. Fla. 1981)...................................................................................... 14

United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.,
    484 U.S. 365, 108 S.Ct. 626 (1988)........................................................................... 13


**STATUTES**

11 U.S.C. § 363............................................................................................................................ 7

## I. INTRODUCTION

Secured Creditor Textron Financial Corporation ("TFC") opposes the Motion for Court Authorization of Use of Cash Collateral (the "Motion") by Debtors, a group of affiliated companies engaged in the manufacture and installation of residential windows and doors, and objects to Debtors' proposed use of TFC's cash collateral, for the following reasons:

- TFC has a blanket first priority security interest in all of Debtors' personal property, including without limitation accounts receivable, inventory, and equipment, to secure a debt of $2,185,765.23 as of the petition date, plus interest, costs, and attorneys' fees.

- The value of Debtors' receivables, inventory, and equipment is barely enough to cover TFC's debt, leaving insufficient equity to provide TFC with adequate protection of its interest sufficient to warrant the use of cash collateral. Indeed, Debtors have asserted that, at least in liquidation, the value of the collateral is less than the amount of the indebtedness.

- Debtors' likelihood of rehabilitation is slim. Their sales have declined in every year since 2004, and have plummeted from $22,900,000 in 2007 to $8,889,000 in 2008, and to $3,578,000 in the first seven months of 2009. Further, Debtors' receivables payments to TFC dropped precipitously immediately prior to bankruptcy. While TFC received almost $100,000 per week in collections from receivables in the first three weeks of July, and Debtors had projected cash receipts of $100,000 per week to continue, total collections for the almost three week period from July 22, 2009 to the petition date of August 11, 2009 were only $73,655.92, far short of the $300,000 projected. Whether the receivables are worth less than represented by Debtors, or Debtors were diverting cash, the value of TFC's collateral is declining.

- The value of TFC's collateral continues to decline as receivables are collected and inventory consumed, and there is no showing of further sales that may be generating receivables of sufficient value to replace the dissipated collateral.

- While Debtors claim to have reached a break-even point, they have provided no evidence whatsoever, not even a basic profit and loss statement, to back up the assertion. Further, although they have been operating in bankruptcy for over a week, they have failed to provide any information as to their post-petition operations.

- Immediately prior to filing bankruptcy, Debtors refused to permit TFC's examiner to conduct a field examination of Debtors' books and records, suggesting that Debtors were indeed diverting cash that they were obligated to remit to TFC.

- Debtors' protestations of the emergency situation in which they find themselves unable to pay their employees is a problem of their own making. Debtors have waited for more than a week before seeking Court authorization to use cash collateral. The situation in which Debtors' tardiness have placed their employees does not provide a proper basis upon which TFC's collateral may be used.

TFC accordingly requests that the Court deny the Motion.

## II.    STATEMENT OF FACTS

### A.    The Financing Relationship Between TFC and Borrower Debtors.

On or about October 27, 2008, TFC and debtors Coastline Manufacturing, LLC ("Coastline"), Pac Bay Window, LLC ("Pac Bay"), Magna Window Corporation ("Magna"), and Elite Window Corporation ("Elite" and, collectively with Coastline, Pac Bay and Magna, "Borrower Debtors"), entered into a written Loan and Security Agreement (the "Loan and Security Agreement") [Declaration of Donald Caskey ("Caskey Decl."), Ex. 1]. Pursuant to the Loan and Security Agreement, (a) TFC agreed, among other things, to make loans and advances to Borrower Debtors, subject to a total credit limit ("Credit Limit") of $3,500,000, including (i) revolving loans, subject to a Revolving Credit Facility with an initial revolving credit limit ("Revolving Credit Limit") of $2,500,000, and subject to the terms and conditions of the Loan and Security Agreement, in accordance with a formula based on, among other things, Borrower Debtors' eligible inventory and accounts receivable ("Revolving Loans") and (ii) a term loan in

1  the sum of $1,000,000 ("Term Loan"), and (b) Borrower Debtors agreed, among other things, to
2  repay to TFC those loans and advances. [Caskey Decl., ¶¶ 7-8 & Ex. 1.]
3     Pursuant to Sections 1.5 and 1.6 of the Loan and Security Agreement, upon expiration or
4  termination of the Revolving Credit Facility, the Term Loan and the outstanding balance of
5  Revolving Loans are due and payable in full. [Caskey Decl., ¶ 9 & Ex. 1.]
6     To secure their obligations under the Loan and Security Agreement, Borrower Debtors
7  granted TFC a first position security interest in all of Borrower Debtors' personal property,
8  including without limitation all accounts, inventory, machinery, equipment, and deposit
9  accounts, and all products and proceeds thereof (collectively, the "Borrower Collateral"). TFC
10 has perfected its security interest in the Borrower Collateral by filing a UCC-1 Financing
11 Statement with the California Secretary of State on or about September 8, 2008 as Filing No. 08-
12 7171193683, Document No. 18317180002. [Caskey Decl., ¶¶ 10-11 & Ex. 2.]

### B. The Secured Guaranties by the Guarantors.

14    On or about October 27, 2008, debtors Window Logic Corp. ("Window Logic") and
15 Pacific Window Corporation ("Pacific Window") (collectively, "Guarantors" and collectively
16 with Borrower Debtors, "Debtors") executed and delivered to TFC a written continuing
17 Guaranty (collectively, the "Guaranties") whereby Guarantors, among other things,
18 unconditionally guaranteed and promised to pay TFC, on demand, any and all indebtedness and
19 obligations owing to TFC under the Loan and Security Agreement and any other existing or
20 future agreement between TFC and Borrower Debtors. [Caskey Decl., ¶ 17 & Exs. 4 & 5.]
21    Pursuant to Section 3 of the Guaranties, Guarantors granted TFC a first position security
22 interest in all of Guarantors' personal property, including without limitation all accounts,
23 inventory, machinery, equipment, and deposit accounts, and all products and proceeds thereof
24 (collectively, the "Guarantor Collateral" and collectively with Borrower Collateral, the
25 "Collateral"). TFC has perfected its security interest in the Guarantor Collateral by filing (a) as to
26 Window Logic, a UCC-1 Financing Statement with the California Secretary of State on or about
27 June 11, 2008 as Filing No. 08-7161132029, Document No. 17290230002, and (b) as to Pacific
28 Window, a UCC-1 Financing Statement with the California Secretary of State on or about

September 8, 2008 as Filing No. 08-7171209792, Document No. 18318890002. [Caskey Decl., ¶¶ 18-19 & Exs. 6 & 7.]

### C.    The Prior Defaults and the Forbearance Agreement.

On or about May 28, 2009, TFC and Borrower Debtors executed, and Guarantors executed a written acknowledgment of, a First Amendment and Forbearance to Loan and Security Agreement ("First Amendment") pursuant to which Debtors acknowledged certain defaults, and TFC agreed, on the conditions set forth in the First Amendment, to forbear until June 30, 2009 from exercising its remedies (other than implementation of a default interest rate) under the Loan and Security Agreement. [Caskey Decl., ¶ 20 & Ex. 8.] Pursuant to the Acknowledgment attached to and included in the First Amendment, Guarantors expressly (a) acknowledged and agreed to the terms of the First Amendment, (b) acknowledged that their Guaranties remain fully valid, binding and enforceable, and (c) waived any claims or defenses against TFC. [Caskey Decl., ¶¶ 25-26 & Ex. 8.]

### D.    The Defaults and Subsequent Bankruptcy.

In addition to other defaults, Borrower Debtors failed to pay the Term Loan or the outstanding balance of the Revolving Loans by the June 30, 2009 expiration of the Revolving Credit Facility, and Guarantors have defaulted on their obligations under the Guaranties by failing to pay to TFC the outstanding balance of the Revolving Loans or the Term Loan ("Guarantor Defaults"). [Caskey Decl., ¶ 29.] On July 2, 2009, TFC sent Debtors a letter demanding immediate payment of the sum of $2,260,331.90 then owing to TFC (the "Demand Amount"). Debtors have not paid the Demand Amount to TFC. [Caskey Decl., ¶ 31 & Ex. 9.] On August 11, 2009, Debtors filed their Chapter 11 petitions.

### E.    The Indebtedness.

The total indebtedness due and owing by Debtors to TFC under the Loan Documents and the Guaranties as of the petition date (August 11, 2009) is $2,185,765.23, plus accruing interest from and after August 7, 2009, attorneys' fees and costs, and other chargeable fees and expenses pursuant to the Loan Documents (collectively, the "Indebtedness"). [Morse Decl., ¶ 6 & Ex. 19.]

### F. Valuation of Collateral

The only components of the Collateral that may have significant value are Debtors' (a) accounts receivable, (b) inventory, and (c) machinery and equipment. As of July 28, 2009, Debtors' total Eligible Accounts was $1,302,012 (intercompany receivables and certain excessively aged receivables have been excluded). The value that TFC may reasonably expect to recover on Debtors' accounts receivable, reflected by the 85% rate at which TFC had made Revolving Loans to Borrower Debtors based on their eligible accounts receivable and deduction of a 10% reserve, is $976,509. [Caskey Decl., ¶¶ 37-42.]

According to an inventory appraisal that TFC obtained from Hilco Appraisal Services, LLC ("Hilco"), the net orderly liquidation value of Debtors' inventory (after deducting costs of sale) is $840,000. TFC accordingly reduced the advance rate on inventory from 45% to 17% to reflect the appraised value of the inventory. [Declaration of Gregory Baldor ("Baldor Decl."), ¶ 3, & Ex. 2; Caskey Decl., ¶¶ 44-45.]

In TFC's experience, a secured lender typically realizes 80% to 85% of the net orderly liquidation value. The 17% figure is approximately 82.5% of the 20.6% figure that Hilco set forth for net orderly liquidation value in the Inventory Appraisal. (In addition, when TFC reduced the inventory advance rate to 17%, it also eliminated the 10% reserve that it had previously deducted from Eligible Inventory to determine Borrower Debtors' eligibility for Revolving Loans.) The value that TFC may expect to recover on Debtors' inventory, based upon the 17% advance rate, accordingly is $644,015. [Caskey Decl., ¶ 46.]

Further, Debtors' inventory may be difficult to sell. Debtors have stated that their inventory largely includes higher end window products that Debtors have been unable to sell because (a) builders are using cheaper products for their current projects and (b) even if Debtors were to sell the higher end products for the same price as cheaper products, to maintain uniformity, the builders would not purchase higher end products if they would still have to use cheaper product for at least some of the homes or buildings in their project. [Caskey Decl., ¶ 47.] Indeed, Debtors' business consultant has stated that the inventory is "nearly valueless" even to

another window assembler. [Declaration of Christopher J. Coutu ("Coutu Decl."), ¶ 3, and Ex. B.]

TFC also obtained an appraisal of Debtors' machinery and equipment. According to the Hilco appraisal, the machinery and equipment have a net orderly liquidation value of $611,125. [Declaration of Marc Rabbow, ¶ 2 and Ex. 1]. Thus, the aggregate value of the Collateral is $2,231,649, which only slightly exceeds the Indebtedness. [Caskey Decl., ¶¶ 33-49.]

### G. Debtors' Post-Petition Pro Forma

On August 13, 2009, Debtors' counsel transmitted a "Pro Forma Receipts and Disbursements" chart for the months of August through October 2009 (the "Pro Forma"). (Declaration of Leo D. Plotkin, Ex. 20; Garthwaite Decl., Ex. A.) The "budget" is as notable for what it lacks as for what it includes. No information is provided concerning the projected level of sales or projected changes in the accounts receivable balance. Rather, there is a single line item for projected receipts, which for all that appears could simply be collection of existing accounts receivable.

Further, the projected receipts ($607,900 in August, $668,690 in September, and $702,125 in October) are unrealistically high. As recently as July 20, 2009, Debtors were projecting collections of approximately $486,000 in August and $588,000 in September. Debtors have not explained why they believe that their collections will increase during bankruptcy, a highly suspect assumption. Moreover, of the $300,000 of receipts Debtors projected for the period from July 22, 2009 to the petition date of August 11, 2009, Debtors actually collected (or at least, turned over to TFC), only $73,655.92. [Morse Decl., ¶ 11 & Ex. 2; Caskey Decl., Ex. 16.] Debtors' projections are not to be given credence.

It should also be noted that the budget provides for monthly rent payments of $87,000. The rent is not paid to a third-party lessor, but rather to the father of Debtors' principal, David Garthwaite. (See Motions for Joint Administration of Cases filed by Debtors on August 17, 2009, which states in the declaration at pp. 2-3 that Mr. Garthwaite is the owner of all six Debtors, and that Debtors pay rent on Debtors' two facilities to a family trust owned by his

father.) In addition, the Pro Forma does not disclose how much of the $150,000 to $172,000 monthly payroll would go to the Garthwaites.

Finally, the budget reflects a sharp increase in planned inventory purchases. Even compared with the budget provided on or about July 20, 2009 [Ex. 16 to Caskey Decl.], Debtors have projected a substantial increase in inventory purchases, which reflects their concession that they need to refocus their sales effort to the lower end of the market, rendering their existing inventory largely useless to them.

### III. THE CASH COLLATERAL MOTION MUST BE DENIED BECAUSE TFC IS NOT ADEQUATELY PROTECTED.

#### A. Debtor Bears the Burden of Proof of Adequate Protection.

Debtors are not entitled to use of TFC's cash collateral because they cannot establish that TFC is adequately protected. See 11 U.S.C. § 363(e). As the debtors-in-possession, Debtors bear the burden of proof on the issue of adequate protection. See id., § 363(p)(1).

#### B. Debtors Have Failed to Demonstrate that TFC's Interests Can be Adequately Protected

Debtors assert that TFC is adequately protected by an "equity cushion" in the Collateral, and that approximately $26,000 per month would be available for periodic cash payments to TFC. Debtors have failed to establish either proposition. Debtors have not established, and cannot establish, that sufficient equity exists, or that Debtors' operations will provide adequate protection.

In an unsuccessful attempt to establish that Debtors' receipts will be sufficient to cover its expenses and make payments to TFC, Debtors have provided only a highly unrealistic Pro Forma that fails to provide any basis upon which it may be concluded that Debtors can continue to survive. The Pro Forma provides an estimate of cash receipts, which purportedly will rise from $607,900 in August, to $668,690 in September, and to $702,125 in October. These estimates, which are made without any foundation whatsoever, are unreasonably high. As recently as July 20, 2009, Debtors were projecting collections of approximately $486,000 in August and $588,000 in September. Debtors provide no explanation for the substantial increase in

-7-
OPPOSITION TO DEBTORS' MOTION TO USE COLLATERAL

projections in such a short time, nor have they explained why their collections will increase during bankruptcy, a highly suspect assumption.

Moreover, of the $300,000 of receipts Debtors projected for the period from July 22, 2009 to the petition date of August 11, 2009, Debtors actually collected (or at least, turned over to TFC), only $73,655.92. [Morse Decl., ¶ 11 and Ex. 18; Caskey Decl., Ex. 16.] Debtors' projections are simply not to be given credence.

Debtors have failed to submit any sales projections whatsoever, so there is no way to ascertain from the Pro Forma whether the projections are based simply upon collection of receivables, which would further erode the collateral base, or the extent to which the receivables are being replaced with new sales. While Debtors submit an unauthenticated sales history for the months and years preceding bankruptcy (Declaration of David Garthwaite ("Garthwait Decl."), Ex. D), there is no projection of sales during bankruptcy, and more importantly no foundation for any such projection.[1] In fact, the sales history demonstrates a dramatic and continuing decline in Debtors' sales, from $22,900,000 in 2007, to $8,889,000 in 2008, to $3,578,000 in the first seven months of 2009. There is no reason to believe—and Debtors have certainly failed to establish—that sales would actually increase following the filing of their Chapter 11 filing, a counterintuitive proposition to say the least.

Debtors tout the purported sales blip in July 2009 (from $542,000 in June to $673,000 in July) as indicative that they are turning their business around, but they fail to acknowledge that in their recent history, July has been one of their biggest months, and that sales dropped off significantly in later summer and fall and into the winter. There is every reason to believe that the historical trend will continue.

Equally disturbing is Debtors' failure to include any form of income statement, without which the Court is completely in the dark as to the results of Debtor's recent operations. Similarly missing is any indication of Debtors' post-petition operations.

---

[1] TFC objects to substantial portions of the Garthwaite Declaration and exhibits thereto on the grounds set forth in the Evidentiary Objections filed concurrently herewith.

The fanciful projections incorporated into the cursory, unsupported Pro Forma is wholly inadequate to support a finding of adequate protection. As the Bankruptcy Court stated in Bankwest, N.A. v. Todd, 49 B.R. 633, 638 (D. S.D. 1985):

> While the question of whether adequate protection exists in a particular case depends upon the nature of the collateral and the nature of the debtor's proposed use of that collateral, *it is plainly not enough for a debtor to make predictions, write them down, and offer them as exhibits showing adequate protection*. [Emphasis added.]

Debtors also assert the existence of an equity cushion, but fail to carry their burden to establish that any equity actually exists. Instead, Debtors simply refer to an unauthenticated spreadsheet purporting to be a consolidating balance sheet as of June 30, 2009. Preliminarily, it should be noted that the information is stale, as it is now late August. Debtors at a minimum should have provided updated financials through at least the end of July 2009. Debtors' financial condition could change significantly in a month. For example, in a consolidating statement as of the end of May 2009, Debtors had cash of $83,487, which was reduced to a negative $53,958 as of the end of June 2009. [Caskey Decl., Ex. 11.]

The spreadsheet lists the receivables at their face value of $1.5 million, without a reserve, and with no aging information. The receivables are plainly overstated as it is highly unrealistic for Debtors to expect to collect 100%, especially under present circumstances.

Debtors' inventory valuation of approximately $4.78 million is also based upon book value, and is grossly overvalued as Debtors have effectively conceded. Debtors have stated that their inventory largely includes higher end window products that Debtors have been unable to sell because (a) builders are using cheaper products for their current projects and (b) even if Debtors were to sell the higher end products for the same price as cheaper products, to maintain uniformity, the builders would not purchase the higher end products if they would still have to use cheaper products for at least some of the homes or buildings in their project. [Caskey Decl., ¶ 47.] Indeed, Debtors' business consultant has stated that the inventory is "nearly valueless" even to another window assembler. [Coutu Decl., ¶ 3, & Ex. B.]

Lastly, Debtors' equipment is also substantially overvalued. Debtors fail to identify the type of equipment they possess, or attempt to establish that accumulated depreciation of only

$280,000 on $2.5 million of equipment is reasonable. Further, book value bears little resemblance to the amount that Debtors could reasonably expect to obtain upon sale.

In short, Debtors have failed to sustain their burden of proving that TFC's interests are adequately protected by an equity cushion. All they have succeeded in demonstrating is that they failed to anticipate the effect of their bankruptcy filing on their employees. The Motion was filed more than a week after Debtors filed their Chapter 11 petitions. Any "emergency" that exists is of Debtors' making, and does not relieve Debtors of their obligation to prove that TFC's interest in the cash collateral can be adequately protected.

In stark contrast to Debtors' showing, TFC has demonstrated that Debtors' equity in the Collateral is in fact negligible. Because Debtors' chances of rehabilitation are, at best, highly speculative (and in reality are downright non-existent), the "appropriate yard stick" for measuring the value of the Collateral is liquidation value. In re Sharon Steel Corp., 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993); see also In re Schwinn Bicycle Co., 192 B.R. 477, 486-487 (Bankr. N.D. Ill. 1996) (holding that "the liquidation value method is the proper valuation standard for the purpose of this case because the Debtor was not financially viable, was in severe financial distress and was on its 'deathbed'", and "[t]o treat such a company as a going concern would be misleading and would, in fact, fictionalize the company's true financial condition."); In re Middleton Place Associates, 1993 U.S. Bankr. LEXIS 2171, at * 41 (Bankr. E.D. Pa. 1993) ("If reorganization is unlikely or the collateral is unnecessary, the collateral will eventually be liquidated or sold ... making liquidation value appropriate").

The use of liquidation value rather than going-concern value is particularly appropriate here because (a) Debtors' sales have suffered a precipitous drop of 61% from 2007 to 2008, and another 35% from the first seven months in 2008 to the first seven months in 2009, (b) Debtors have conceded that sales must increase in order for it to survive, but that that such increased sales will require additional working capital which Debtors will be unable to borrow, (c) Debtors are unable to utilize most of their existing inventory because the nature of their business has changed fundamentally from high-end residential to lower-cost construction, and they are unable to sell the high-end products even for the price of the cheaper windows because their builder customers

do not want to mix high and low-end products in their developments, (d) Debtors will need to purchase substantial amounts of new inventory to meet the needs of the cheaper-priced products demanded by their builder customers, and (e) its working capital needs can only be met through use of funds generated by sales. [Garthwaite Decl., Ex. D; Caskey Decl., ¶ 47; Coutu Decl., ¶ 3, & Ex. B.]

As set forth in Part II.F above, TFC estimates that the liquidation value of Debtors' personal property is $2,231,649, consisting of $976,509 of receivables, $644,015 of inventory, and $611,125 of equipment. (It should be noted that Debtors' business consultant opined that TFC would receive less than $ .10 on the dollar for inventory and equipment [Coutu Decl., ¶ B].) In light of TFC's debt as of the petition date of $2,185,765.23, the 2% "cushion" plainly does not provide adequate protection.

Case law has almost uniformly held that an equity cushion under 11% is insufficient to constitute adequate protection. Kost v. First Interstate Bank of Greybull, 102 B.R. 829, 831-32 (D. Wyo. 1989); see also, In re Atrium Development Co., 159 B.R. 464, 471 (Bankr. E.D. Va. 1993); In re Mediterranean Associates, L.P., 1993 WL 541671, at *2 (E.D. Pa. 1993). Here, the equity cushion is virtually non-existent.

Even if an apparently sufficient equity cushion exists, which it definitely does not here, the issue of adequate protection to a creditor is determined on a case-by-case basis rather than by mechanical application of a formula. Kost, 102 B.R. at 831. Thus, an analysis of whether adequate protection exists typically goes beyond the issue of whether an "equity cushion" exists, and adequate protection will not be found if (a) the debtor has no reasonable chance of reorganization, (b) the collateral threatens substantially to decline in value, or (c) debtor's business plans may result in rapid deterioration of the collateral.

In In re American Sweeteners, Inc., 2000 WL 1010582, at *4 (Bankr. E.D. Pa. 2000), the court explained as follows:

> Before examining the adequate protection offered to the creditor, the Court should consider whether there is any reasonable chance of reorganization, for if there be none, there is no point in jeopardizing the creditor's cash collateral. In re C.F. Simonin's Sons, Inc., 28 B.R. 707, 711 (Bankr. E.D. N.C. 1983). [Footnote omitted.] While almost all Chapter 11 cases involve an element of risk, a high degree of uncertainty

-11-
OPPOSITION TO DEBTORS' MOTION TO USE COLLATERAL

> is a factor to be considered in evaluating the secured creditor's adequate protection. Thus, I reject Debtor's notion that it is entitled to use cash collateral without regard to the Debtor's business operations so long as an equity cushion provides adequate protection of MCP's collateral."

In <u>LNC Investments, Inc. v. First Fidelity Bank, N.A.</u>, 1997 WL 528283, at *6 (S.D.N.Y. 1997), the court noted,

> "[R]ecent decisions in this Circuit have rejected the equity cushion approach in favor of a more individualized analysis of the specific risks threatening the collateral." [Citation omitted.] In <u>In re Elmira Litho, Inc.</u>, 174 B.R. 892 (Bankr. S.D.N.Y. 1994), the Court noted that "an equity cushion can, under certain circumstances, serve as a form of adequate protection," <u>id.</u> at 904, but that to establish a lack of adequate protection, a secured creditor need show only that the value of the collateral is declining as a result of the automatic stay. <u>Id.</u> at 902; <u>see also</u> <u>LNC III</u>, 1995 WL 231322, at *4 (citing cases in which courts have emphasized actual or likely diminution in value of the collateral during pendency of bankruptcy to establish lack of adequate protection). Thus, despite the existence of an equity cushion, a Bankruptcy Court could find a lack of adequate protection based on a threatened decline in the value of the collateral.
>
> Here, . . . I held previously that the Bankruptcy Court might have found a lack of adequate protection despite the existence of a 50% equity cushion. <u>Id.</u> at *5. Indeed, I noted that "while it may be unfair to view events in hindsight, the rapid erosion of the equity cushion suggests it was possible to anticipate the danger ultimately realized." <u>Id.</u>

While the <u>American Sweeteners</u> court holds that examination of debtor's business operations is always required (even where an equity cushion exists), and the <u>LNC</u> court advocates an individualized analysis of the specific risks threatening the collateral over an equity cushion analysis (holding that even a 50% equity cushion may not be sufficient in the face of serious risks to the collateral), other courts have focused upon whether, when an equity cushion does exist, it will be dissipated by continuing business operations. As stated in <u>In re Sharon Steel Corp.</u>, <u>supra,</u> 159 B.R. at 169:

> We believe it improper to look at valuation of assets in a vacuum. While the present value of a debtor's assets may be sufficient to constitute adequate protection, a debtor's future operational plans may result in a rapid deterioration of the collateral. Where an equity cushion is insufficient in size or likely to erode, it cannot, standing alone, constitute adequate protection. <u>See</u> <u>In re Liona Corp.</u>, 68 B.R. 761, 767 (Bankr.E.D.Pa. 1987).
>
> We view the issues in the present matter as: 1) Whether the value of the Debtor's assets exceed the amount of its secured obligations, thus providing an equity cushion for the Lenders, and 2) If an equity cushion exists, whether that equity cushion provides the Lenders with sufficient adequate protection . . . . .

-12-

OPPOSITION TO DEBTORS' MOTION TO USE COLLATERAL

1    See also In re Liona Corp., N.V., 68 B.R. 761, 767 (Bankr. E.D. Pa. 1987) (holding that "the existence of an equity cushion, by itself, does not always adequately protect the interest of a secured factor. Various factors must also be considered", including, among others, the size of the equity cushion and the rate at which it will be eroded); In re Colrud, 45 B.R. 169, 173, 179-80 (Bankr. D. Alaska 1984) (finding that even an equity cushion of well over 100% did not constitute adequate protection in view of serious risks).

Moreover, any adequate protection inquiry must focus on whether or not the debtor's use of cash collateral will reduce the value of the secured creditor's collateral base post-petition, i.e., whether that collateral base has, or is likely to, deteriorate post-petition. United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 108 S.Ct. 626 (1988).

Here, (a) Debtors' ability to reorganize is highly speculative at best as their sales and collections have plummeted, and they have attempted to shift production to lower-cost products that their working capital cannot support (American Sweeteners test), (b) any equity cushion which may exist cannot constitute adequate protection because accruing interest and attorneys' fees will rapidly consume the minimal amount of equity (Sharon Steel test), and (c) TFC's collateral base will quickly deteriorate as receivables are collected and inventory is consumed and not replaced with receivables generated by new sales (Timbers test). Debtors accordingly cannot adequately protect TFC's interest in the collateral.

Simply put, any equity cushion that the Court finds to exist is plainly insufficient to protect TFC from Debtor's deteriorating financial condition, and Debtors have no unencumbered cash with which to make adequate protection payments. The claimed equity cushion is plainly insufficient to provide adequate protection of TFC's interest in the Collateral, and Debtors have failed to establish that TFC is otherwise adequately protected. The Motion should be denied.[2]

---

[2] Debtors have claimed that TFC refuses to turn over property of the estate, consisting of checks received in the lock box maintained by JP Morgan Chase. TFC previously instructed JP Morgan Chase to forward such checks to Debtors' counsel.

-13-

OPPOSITION TO DEBTORS' MOTION TO USE COLLATERAL

## IV. ANY ALLOWANCE OF THE USE OF CASH COLLATERAL MUST BE STRICTLY CONDITIONED.

TFC strongly believes that there is no basis for an order permitting Debtors to use any of TFC's cash collateral. In the event the Court is nonetheless inclined to permit some use of cash collateral, such authorization should be strictly conditioned. During the initial stages of a bankruptcy proceeding, cash collateral orders should be confined to meet emergency expenses. Bankwest, N.A. v. Todd, 49 B.R. 633 (D.S.D. 1985). Given that cash is highly volatile, and subject to rapid dissipation, it requires special protective safeguards in order to assure that a holder of a lien on cash collateral is not deprived of its collateral through unprotected use by the debtor. Matter of Mickler, 9 B.R. 121, 123 (M.D. Fla. 1981).

If for any reason the Court, despite the ample evidence that TFC is not adequately protected, nonetheless believes that it would be appropriate to permit Debtors to use cash collateral on an interim basis, then such usage should be severely restricted and subject to all of the following conditions:

First, Debtors shall be precluded from making any payments to the Garthwaites or rent payments to David Garthwaite's father, an obligation that amounts to over $60,000 of the $317,357 Debtors seek to use.

Second, Debtors may not use cash collateral for any other expenses other than those set forth on Debtors' Emergency Cash Expenditures chart, and may not spend more than the stated amounts for each line item, including the amounts that are "estimated."

Third, Debtors will be permitted to incur an expense (whether paid or accrued) for a line item in the Emergency Cash Expenditures chart if and only if Debtors have generated and invoiced post-petition sales in an amount at least equal to the amount of such expense (whether paid or accrued) plus the cumulative total of all previous expenses (whether paid or accrued) for all line items on such chart, in order to ensure that TFC's collateral will not suffer further deterioration.

1     Fourth, Debtors shall provide TFC with a post-petition replacement lien on all assets of Debtors, who shall cooperate with TFC to execute such documentation, and deliver any documents, required to allow TFC to perfect its interest in such assets.

    Fifth, TFC shall receive an administrative super-priority lien to the extent that the replacement lien is inadequate.

    Sixth, TFC shall have the right to have a designated representative present at Debtors' facilities, with full access to all of Debtors' books and records, including its computers.

    Seventh, Debtors shall provide TFC with borrowing base certificates on a daily basis, together with a statement of all sums paid on such date and any additional accrued expenses that have not been paid.

    Eighth, Debtors shall on each Tuesday provide TFC with a comparison of Debtors' projected performance to their actual performance, including sales, revenues, inventory, and accounts receivable figures, for the previous week ending on Saturday, in a mutually acceptable form, with the first report to be provided by August 25 for all post-petition activities through August 22.

    Ninth, Debtors shall make David Garthwaite available for a Rule 2004 examination on a mutually-agreeable date prior to the next cash collateral hearing.

    Tenth, Debtors shall make adequate protection payments to TFC in such amount as the Court may determine.

## V. CONCLUSION

For the foregoing reasons, TFC respectfully requests that the Court deny Debtors' motion for an order authorizing use of cash collateral or in the alternative, limit such use in accordance with the conditions set forth in Part IV above.

DATED: August 19, 2009

LEVY, SMALL & LALLAS
A Partnership Including Professional Corporations

By: _____
LEO D. PLOTKIN
Attorneys for Secured Creditor
Textron Financial Corporation

-15-
OPPOSITION TO DEBTORS' MOTION TO USE COLLATERAL

| In re:<br>Coastline Manufacturing, LLC | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER 6:09-bk-28324-BB |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

815 Moraga Drive, Los Angeles, CA 90049-1633

A true and correct copy of the foregoing document described <u>Secured Creditor Textron Financial Corporation's Objection and Opposition to Debtors' Motion for Court Authorization of Use of Cash Collateral</u> will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On August 19, 2009, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Riordan J. Zavala, Esq.                     rjzlaw@adelphia.net
U.S. Trustee                                ustpregion16.rs.ecf@usdoj.gov
Elizabeth A. Lossing on behalf of U.S. Trustee    elizabeth.lossing@usdoj.gov

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On _____ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 19, 2009 | Heidi Petrilli | /s/ Heidi Petrilli |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                      F 9013-3.1